IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COMPETITIVE EDGE, INC, and )
DAVID M. GREENSPON, )
        )
        Plaintiffs, )
     v. )         Case No. 08 C 0956
        )
STAPLES, INC. and STAPLES THE )      Judge Virginia M. Kendall
OFFICE SUPERSTORE EAST, INC., )
        )
        Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Competitive Edge, Inc. ("Competitive Edge") and David M. Greenspon ("Greenspon") (collectively "Plaintiffs") filed suit against Defendants Staples, Inc. and Staples the Office Superstore East, Inc. (collectively "Staples") for design patent infringement and trade dress infringement. Specifically, Plaintiffs claim infringement of U.S. Design Patent No. D530,734 ("the '734 patent") pursuant to 35 U.S.C. § 271 (Count I). Plaintiffs also claim infringement of Plaintiffs' purported trade dress in connection with the AdVantage Bubble Calculator (Count II), pursuant to 15 U.S.C. § 1125(a). Staples now moves for summary judgment on both counts on grounds of non-infringement. For the reasons stated below, the Motion for Summary Judgment on non-infringement of the '734 patent is granted and the Motion for Summary Judgment on non-infringement of the alleged trade dress is granted. Staples's Motion to Strike Competitive Edge's Rule 56.1 Statements is denied. Staples's Motion to Exclude the Testimony of Dr. Eldon Little is granted.

## STATEMENT OF UNDISPUTED FACTS[1]

---

[1] Throughout this Opinion, the Court references the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Plaintiffs' Response to Staples's Statement of Material Facts Regarding Plaintiffs' Design Patent have been abbreviated to "CE DP 56.1 Resp. ¶ __."; citations to Plaintiffs' Response to Staples's Statement of

# I. Staples's Motion to Strike Plaintiffs' Rule 56.1 Statements

Staples has moved to strike those portions of Plaintiffs' 56.1 statements that exceed forty facts in violation of Local Rule 56.1. (R. 76 at 2.) District courts are "entitled to expect" that parties will strictly comply with the Rule. *See Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)).

Local Rule 56.1 allows a party opposing summary judgment to file a response including no more than "40 separately-numbered statements of additional facts." L.R. 56.1(3)(C). The Court does not find that each and every separate sentence that Staples has labeled as separate fact does, in fact, constitute a separate "statement[] of additional fact[]" for the purposes of L.R. 56.1; some, as argued by Plaintiffs, represent only attempts to present complex information in an understandable and readable format. (*See* R. 80 at 6.) However, even a lenient review shows that Plaintiffs have clearly submitted more than forty separate statements of fact in both of their Rule 56.1 statements. While this is a technical violation of Local Rule 56.1, the Court's review of the multi-fact paragraphs reveals that for the most part the facts within each paragraph are logically connected, are supported by reference to the same materials, and are thus compliant "with the spirit if not the letter of the Local Rule." *Portis v. City of Chicago*, 510 F. Supp. 2d 461, 463 (N.D. Ill. 2007). Staples's Motion to Strike is therefore denied.

Plaintiffs' lengthy responses to Staples's proposed statements of undisputed facts, which often go far beyond merely disputing the fact at issue and introduce new and independent facts, violate both the letter and the spirit of Local Rule 56.1. The Court has disregarded any new facts

---

Material Facts Regarding Plaintiffs' Trade Dress have been abbreviated to "CE TD 56.1 Resp. ¶ __." citations to Staples's Reply to Plaintiffs' Statement of Additional Material Facts Regarding Design Patent have been abbreviated to "Staples DP 56.1 Reply ¶ __."; and citations to Staples's Reply to Plaintiffs' Statement of Additional Material Facts Regarding Trade Dress have been abbreviated to "Staples TD 56.1 Reply ¶ __."

improperly raised in Plaintiffs' responses to Staples's Local Rule 56.1 statements rather than properly raised in Plaintiffs' own statement of additional facts. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008) (district court properly refused to consider responses consisting of "extremely long, argumentative paragraphs" that both disputed the moving party's statements of fact and presented new facts).

## II. The Parties

Competitive Edge, a distributor of advertising specialties and promotional products, is an Indiana corporation with its principal place of business in Des Moines, Iowa. (CE TD 56.1 Resp. ¶¶ 1, 2.) Competitive Edge doing business as AdVantage Industries ("AdVantage") is a supplier of advertising and promotional products. (CE TD 56.1 Resp. ¶ 2.) Greenspon is the founder, sole owner, President, sales manager, and secretary of Competitive Edge. (CE TD 56.1 Resp. ¶ 3.)

Staples is an office supply chain with retail stores in Chicago as well as throughout the United States and Canada, a catalog and internet presence, and a contract business that serves medium-sized businesses and organizations. (CE DP 56.1 Resp. ¶ 5; CE TD 56.1 Resp. ¶¶ 4, 9.) Staples's business includes the sale of customizable products. (Staples TD 56.1 Reply ¶ 10.)

## III. Competitive Edge's Bubble Calculator

Greenspon owns the '734 patent, which is entitled "Calculator." (CE DP 56.1 Resp. ¶ 10.) Greenspon has neither licensed nor assigned the rights in the '734 Patent to any other party. (CE DP 56.1 Resp. ¶ 11.) A representative drawing from the '734 patent is depicted below.



All features of the design in the '734 patent are depicted using solid, unbroken lines; there are no broken lines used in the figures of the patent.  (CE DP 56.1 Resp. ¶ 27.)  Among other features, the '734 patent depicts a removable I.D. plate and shows the plate in place on the calculator design when assembled.  (CE DP 56.1 Resp. ¶ 25.)  The patent also shows a recessed display screen, that is, a screen whose surface sits below the overall surface of the calculator's face.  (CE DP 56.1 Resp. ¶ 54.)  The patent shows a particular arrangement of function keys.  (CE DP 56.1 Resp. ¶ 56.)

Since 2004, Competitive Edge and AdVantage Industries (a division of Competitive Edge) have supplied and distributed a product called The "Original" Silicone Bubble Calculator.  (CE TD 56.1 Resp. ¶ 15; Staples TD 56.1 Resp. ¶ 1.)  This calculator is also known as The AdVantage Bubble Calculator.  (CE TD 56.1 Resp. ¶16.)  Competitive Edge stamps the back of the calculator with "AdVantage Industries" and "patent pending."  (Staples TD 56.1 Reply ¶ 3.)  A representative example of the AdVantage Bubble Calculator is depicted below.



Competitive Edge offers the AdVantage Bubble Calculator for sale at bulk pricing. (CE TD 56.1 Resp. ¶ 41.) The purchasers of the AdVantage Bubble Calculator are customers of distributors and bulk buyers of promotional products. (CE DP 56.1 Resp. ¶ 34.) The standard available colors of the AdVantage Bubble Calculator are subject to change with changing trends and tastes in color. (CE TD 56.1 Resp. ¶¶ 46, 47.) The calculators are always sold with a color scheme in which the keys and other parts of the calculator body are "the same bright, whimsical color, with only the numbers and symbols on the keys and/or the decoration panel being a different color." (CE TD 56.1 Resp. ¶ 12.) Purchasers are able to order the calculator customized with their corporate logo or in a specific color, and Competitive Edge will customize the calculator in "any color." (CE TD 56.1 Resp. ¶¶ 42, 48.)

Competitive Edge has spent approximately $400,000 on advertising materials, such as catalogs, that include depictions of the AdVantage Bubble Calculator. (Staples TD 56.1 Resp. ¶ 38.) The AdVantage Bubble Calculator is "not a huge selling product" and Competitive Edge does not contend that its sales revenues are probative of its trade dress in the calculator having acquired secondary meaning. (CE TD 56.1 Resp. ¶¶ 39, 64.)

Distributors of the product often assign a product number to the calculator that is different from the product number that AdVantage uses. (CE TD 56.1 Resp. ¶ 40.)

## IV. Staples's Calculators

Staples once imported a product called "Staples Brand Bubble Calculator" from China. (CE DP 56.1 Resp. ¶ 14; CE TD 56.1 Resp. ¶ 18.) The Staples Brand Bubble Calculator was "strikingly similar" to the design disclosed in the '734 Patent. (Staples DP 56.1 Reply ¶ 36.) Sales of the

Staples Brand Bubble Calculator were "very strong" in the 2006 summer season. ((Staples DP 56.1 Reply ¶ 13.)

Greenspon notified Staples through a posting on Staples's website that Competitive Edge owns the '734 Patent and noted infringement concerns. (CE DP 56.1 Resp. ¶ 15.) Staples then entered into a license agreement with Competitive Edge with respect to the calculators that Staples had ordered prior to receiving notification of the patent claims. (CE DP 56.1 Resp. ¶ 16.) Under the license agreement, Staples agreed to pay $200,000 "in consideration of the settlement of all possible legal and equitable claims." (*Id.*) The license agreement further authorized Staples to "manufacture, make, produce, import, develop, market, distribute, lease, transfer, convey, dispose of, and sell" a number of Staples Brand Bubble Calculators. (*Id.*) The current suit does not include any claims related to unlicensed sales of the Staples Brand Bubble Calculator. (CE DP 56.1 Resp. ¶ 13.)

In response to the dispute regarding the Staples Brand Bubble Calculator, Staples worked with designers and intellectual property counsel to create a new calculator product. (CE DP 56.1 Resp. ¶ 20.) The project was referred to internally as "Bubble Calculator – next generation of bubble." (Staples TD 56.1 Reply ¶ 32.) During this design process, Staples's outside counsel advised Staples that "the more you get away from the scalloped shape of the buttons, the safer you will be" with respect to avoiding infringement of the '734 patent. (Staples DP 56.1 Reply ¶ 17.) Counsel further advised that "the most significant design change you can make is to alter the scalloped shape of the buttons, such as by flattening the top surface of the buttons . . . ." (Staples DP 56.1 Reply ¶ 19.)

Staples eventually began to import and sell a calculator called the Staples Brand Pillow Top Calculator (the "Pillow Top Calculator"), although the degree of connection between the "next generation of bubble" project and the Pillow Top Calculator is disputed. (CE TD 56.1 Resp. ¶¶ 6, 23; Staples TD 56.1 Reply ¶ 32.) Staples also has used Pillow Top Calculators for promotional and marketing purposes. (CE DP 56.1 Resp. ¶ 6; CE TD 56.1 Resp. ¶ 43.) Staples's Pillow Top Calculator is depicted below.



In addition to the Pillow Top Calculator, Staples continues to sell its remaining inventory of the Staples Brand Bubble Calculator. In at least two retail stores the Pillow Top Calculator and Staples Brand Bubble Calculators have been found mixed in the same sales bin without external packaging. (Staples DP 56.1 Reply ¶ 21, 24.)

The logo area of the Pillow Top Calculator is not removable, and Staples never imprints the calculator with any other logo than that of Staples. (CE DP 56.1 Resp. ¶ 30; CE TD 56.1 Resp. ¶ 43.) The display screen of the Pillow Top Calculator does not sit below the overall surface of the calculator's face. (CE DP 56.1 Resp. ¶ 55.) At least some Pillow Top calculators have the same functional-key layout as that shown in the '734 patent. (CE DP 56.1 Resp. ¶ 57.)

Both the design of the '734 patent and the Pillow Top Calculator have buttons that are part of a continuous contoured surface. (Staples DP 56.1 Reply ¶ 2.) Both have keys that are convex,

with the highest point of each key at the center of the key. (Staples DP 56.1 Reply ¶ 3.) Both share a color scheme consisting of one solid color for the body of the calculator, excepting any visible logo, with a separate color used to mark the numbers on the keys. (Staples DP 56.1 Reply ¶ 7.) The area of the Pillow Top Calculator on which Staples's logo is displayed is the same part of the calculator as the area in which the '734 patent's removable I.D. plate is affixed. (Staples DP 56.1 Reply ¶ 9.)

In addition to the Pillow Top Calculator, Staples continues to sell its remaining inventory of the Staples Brand Bubble Calculator. In at least two retail stores the Pillow Top Calculator and Staples Brand Bubble Calculators have been found mixed in the same sales bin without external packaging. (Staples DP 56.1 Reply ¶ 21, 24.)

U.S. Design Patent No. D559,891 ("the '891 patent") was issued on January 15, 2008 with rights under the patent assigned to Staples. (CE DP 56.1 Resp. ¶ 19.) Competitive Edge disputes that the Pillow Top Calculator design is the same design as that protected by the '891 patent; Competitive Edge's expert, Dr. Eldon Little, testified that the design in the patent is not the design of the Pillow Top Calculator. (CE DP 56.1 Resp. ¶ 19; Staples DP 56.1 Reply ¶ 38.) A representative drawing from the '891 patent is depicted below.



## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. Adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

## DISCUSSION

### I. Staples's Motion to Exclude the Expert Testimony of Plaintiffs' Expert

Dr. Eldon Little ("Little") conducted a survey and an experiment supporting Plaintiffs' claims of patent and trade dress infringement, and prepared an expert report that Plaintiffs seek to admit into evidence. The survey consisted of asking respondents, who were primarily college students,

to compare the Staples Pillow Top calculator to the '734 patented design and then with Competitive Edge's Bubble Calculator, and to answer five questions about the comparisons. (*See* R. 82, Pl. Reply Br. at 10-11.) Little created the survey, which was administered by Mr. Gary Lynn ("Lynn") and Mr. Hosein Fallah. (Lynn Dep. 57: 22-58: 14.) The experiment was a classroom experiment designed by Little in order to simulate the purchasing situation in which prospective consumers of the two calculators might find themselves. (*See* R. 82, Pl. Reply Br. at 13.) Little created and administered the experiment.

Whether scientific expert testimony is admissible is determined by reference to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Plaintiffs, as the proponent of Little's testimony, bear the burden of proof with respect to whether the admissibility requirements are met. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009).

Rule 702 assigns the trial judge "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 492 F.3d at 597. The focus of this decision "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 492 F.3d at 595. The Seventh Circuit has developed a three-step analysis for determining the admissibility of expert testimony under Rule 702. *See Ervin*, 492 F.3d at 904. First, "the witness must be qualified 'as an expert by knowledge, skill experience, training, or education.'" *Id.* (quoting Fed.R.Evid. 702). Second, "the expert's reasoning or methodologies underlying the testimony must be scientifically reliable." *Id.* Third, the expert's testimony must be relevant, that is, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.*

Little's proposed testimony is based on the data collected from the survey and experiment described above. The admissibility of the survey and experiment is therefore dispositive of the admissibility of the testimony itself.

Little is a professor of marketing with thirty years of experience who has authored numerous books, articles and papers in the areas of consumer behavior and survey research. Most likely recognizing this, Staples does not challenge Little's qualifications or the relevance of his proposed testimony.[2] Instead, Staples challenges Little's methodology, arguing that the methodology used in creating and administering the survey is unreliable. Survey evidence offered in support of, or in opposition to, summary judgment "must comply with the principles of professional survey research; if it does not, it is not even admissible . . . ." *Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th Cir. 2007).

## A. Little's Survey

### (i) *Identification of the "Universe."*

The probative value of a survey depends in large part upon the "universe" of respondents, and the reliability of the survey is diminished if the universe of desired respondents is erroneous or undefined. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 n.5 (7th Cir. 1992) (noting that a survey designed to demonstrate secondary meaning had failed to target all relevant purchasers). Little did not define a universe when developing the survey. (Little Dep. 167:19-23.)

---

[2] However, the Court notes that in addition to the portions of his testimony that are based upon the survey and the experiment, Little's planned testimony includes analysis of the '734 patent, whether there is infringement of the '734 patent in this case, discussion of trade dress infringement, and analysis of secondary meaning with respect to trade dress doctrine. (Little Rep. 4.) Little's educational and professional background does not show expertise in the areas of patent infringement, patent claim construction or analysis, comparison of patent claims, trade dress infringement, secondary meaning, or likelihood of confusion. Further, Little states "*I have been informed* that determining patent infringement is a two-step process." (Little Rep. ¶ 11 (emphasis added).) This statement further indicates a lack of expertise in the area of patent infringement. The Court therefore finds that Little is unqualified to testify as an expert witness with respect to these issues.

Later, however, he defines the universe as the general purchasing public with an ability to perceive. (Little Dep. 165:17-166:5.)  The reliability of the survey is diminished by Little's failure to define his target universe, and its relevance is greatly harmed by his failure to focus the survey on the consumers in the market at issue in this case.  *See Spraying Sys. Co.*, 975 F.2d at 394; *see also Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487-88 (5th Cir. 2004) (a valid survey must interview individuals who "adequately represent the opinions which are relevant to the litigation").

(ii) *Selection of the Sample Population.*

Once a universe is identified, a reliable survey must select a sample population that accurately represents the universe.  Little's report discusses the population sampled, noting that it consisted of college students because "they are familiar with calculators" and this "was a conservative approach." (Little Rep. ¶ 19.)[3]  However, the report contains no discussion of the target population, of any differences between a target population and the college students, or of any consequences resulting from this difference.  The survey population of college students is underinclusive, and thus the survey's value depends on the extent to which the excluded population is likely to react differently from the included population.  Little does not analyze this issue, but only states that, based on "common sense," college students represent a "conservative population" for the survey. (Little Dep. 183:14-184:20.)  Without a more adequate justification, however, the underinclusive sample population seriously diminishes the reliability of the survey.  *See, e.g., Jaret Intern., Inc. v. Promotion in Motion, Inc.*, 826 F. Supp. 69, 74 (E.D.N.Y. 1993) (finding a consumer confusion survey inadmissible because of, among other flaws, "its unrepresentative sample and its untrustworthy methodology.")

---

[3] Citations to the Expert Report of Dr. Eldon L. Little, III are abbreviated as "Little Rep. ¶ __."

(iii) *Clear, Precise, and Unbiased Questions.*

A reliable survey should avoid the use of confusing or ambiguous questions. *See, e.g., Nat'l Football League Props., Inc v. ProStyle, Inc.*, 57 F. Supp. 2d 665, 668 (E.D. Wis. 1999) (survey consisting of only one vague question, with no controls or comparison questions, excluded from evidence). The questions in Little's survey, however, are replete with potential ambiguities. For example, questions 4 and 5 ask whether the respondent thinks the calculators "come from a single source." (R. 82-2, exhibit H, 4.) Survey respondents could interpret "source" to mean manufacturer, retail store, country of origin, or one of many other potential sources. Lynn testified that a respondent may have been confused and asked about this language. (Lynn Dep. 60:21-61:8.) This potential confusion undermines the reliability of the survey, even though the existence of any actual confusion as to the meaning of the questions cannot be ascertained.

(iv) *Filter Questions.*

Some respondents to a survey will not have an opinion on a question asked, which can result in a respondent guessing as to the "right" answer. Reliable surveys address this issue through the use of filter questions and "don't know" or "no opinion" answer alternatives. *See, e.g., LG Elecs. USA, Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 954 (N.D. Ill. 2009) (finding that a survey's inclusion of a "don't know" option as an answer to an otherwise close-ended question was sufficient to mitigate concerns about its reliability). Here, the questions used in the survey allowed for only "yes" or "no" responses. (*See* R. 82, Exhibit H.) The survey's reliability is significantly compromised by its failure to use open-ended questions or to allow for "don't know" responses. *See id.*

(v) *Double-Blind Study.*

In order to ensure their objectivity, reliable surveys are conducted using double-blind research methodology whenever possible. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Cons. Pharms. Co.*, 290 F.3d 578, 590-91 (3rd Cir. 2002) (upholding the district court's reliance on a survey "during which both the respondents and the interviewers [were] unaware of the purpose of the survey or its sponsor.")  Here, the administrators knew that the survey was intended for use in a patent infringement case.  (Lynn Dep. 24:13-19, 62: 17-21.)  The takers also potentially knew the purpose of the survey before taking it. (Lynn Dep. 61:12-64: 18.)  Failure to conduct an appropriate double-blind study limits the reliability of the survey.

(vi) *Data Collection and Recording.*

Steps must be taken to ensure that data are classified and recorded consistently and accurately. Little testified that he received all the survey responses from Lynn "in one batch." (Little Dep. 149:22-150:2.)  Lynn, however, testified that he sent each day's results separately.  (Lynn Dep. 39:15-17.) Further, two different people administered the Survey, and did not use a uniform method of administration. (Lynn Dep. 53:16-54:10.)  Worse, it is possible that certain respondents took the survey more than once.  (Lynn Dep. 48:12-16.)  The Court's confidence in the reliability of the survey's collected data is gravely diminished by these collection and recording irregularities.

**B.  Little's Experiment**

As Little's classroom experiment was simply another survey of potential consumer responses, conducted in a different format with a different methodology, the same standards applied to the admissibility of the survey apply to the experiment as well.

(i) *Identification of the "Universe."*

Little did not define a universe for the experiment. (Little Dep. 209:8-11.)  This renders the reliability and relevance of the experiment highly questionable.

(ii) *Selection of the Sample Population.*

The sample population for the experiment was the students in Little's class.  (Little Dep. 208:19-20.)  There is no discussion in Little's report as to the characteristics of the target population, nor any explanation of any relevant differences between the  target population and the college students, or any analysis of any consequences that may have resulted from these differences.

(iii) *Other Concerns.*

The experiment was conducted on two separate days, 48 hours apart—that is, certain calculators were shown to students on one day; other calculators were shown to the same students two days subsequently, and students were asked if they thought they had seen the same samples more than once.  (*See* Little Rep. at 12.)  The only rationale for the time delay is Little's belief that it "was representative of the level of involvement of a typical consumer in the purchasing situation involving a hand-held calculator."  (*Id.*)  This would be generally appropriate in the trademark context, because surveys testing consumer confusion should mimic market conditions, including the context in which purchases are made.  *See Coherent, Inc. v. Coherent Techs.*, 935 F.2d 1122, 1126 (10th Cir. 1991) (rejecting survey that did not appropriately mirror market conditions); *Simon Prop. Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 1038 (S.D. Ind. 2000) ("[A] survey to test likelihood of confusion must attempt to replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace.").  There is no evidence here, however, that a 48-hour delay has any bearing on the conditions under which purchasers of the products at issue here,

15

whom Plaintiffs admit to be sophisticated consumers of advertising and promotional specialities, make their buying decisions.

An additional concern about the validity of the experiment is raised by the fact that the Staples Pillow Top Calculator and the AdVantage Bubble Calculator used were both purple and were the only two purple calculators used in the experiment. (*See id.* at 12, Ex. 4.) Thus, there is no way to determine whether the students were remembering anything about the design of the calculator that they had previously seen as opposed to merely recalling its color.

### D. Whether a Hearing is Required to Determine Admissibility

The district court is not required to conduct a hearing when considering whether proposed expert testimony should be admitted. *See United States v. Ozuna*, 561 F.3d 728, 737 (7th Cir. 2009); *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998). It is within the court's discretion to decide whether there is a sufficient basis to exclude expert testimony without holding a hearing. *See Kirstein*, 159 F.3d at 1067. In light of Little's failure to comply with generally-accepted principles of survey research and lack of evidence to show that he satisfies the requirements of Rule 702, the Court finds there is a sufficient basis for excluding Little's expert testimony without a hearing. Expert testimony regarding the behavior and expectations of consumers in the marketplace is usually relevant because consumer behavior is a critical factor in the consideration of trade dress infringement allegations. *See Braun Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 828 (Fed. Cir. 1992). Here, however, the Court finds that the methods used in the administration of both the survey and the experiment render the data collected of so little reliability and utility as to be irrelevant. *See Evory*, 505 F.3d at 776. Little's proposed testimony provides no helpful evidence as to the actual behavior of actual consumers of the products at issue in this litigation, and is therefore excluded.

Staples's Motion to Strike Little's proposed testimony is therefore granted. The Court's analysis of Staples's Motions for Summary Judgment will proceed without reference to Little's expert report.

## II. Design Patent Infringement

A design patent may issue to the inventor of "any new, original and ornamental design . . . ." 35 U.S.C. § 171. "A design patent protects the nonfunctional aspects of an ornamental design as shown in the patent." *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 2005). The patent is infringed by the application of "the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale . . . ." 35 U.S.C. § 289. The patented and allegedly infringing designs need not be identical for infringement of a design patent to be found. *See OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997).

As the Federal Circuit has recently clarified, the inquiry that governs analysis of design patent infringement is "whether an ordinary observer, familiar with the prior art, would be deceived into thinking that the accused design was the same as the patented design." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 672 (Fed. Cir. 2008). This "ordinary observer" test is to be applied with consideration of the prior art as a general frame of reference, but "without any 'point of novelty' perspective." *Crocs, Inc. v. Int'l Trade Comm'n*, __ F.3d __, 2010 WL 638272 (Fed. Cir. Feb. 24, 2010). "Infringement will not be found unless the accused article embodies the patented design or any colorable imitation thereof." *Egyptian Goddess*, 543 F.3d at 678 (internal quotations omitted).

The Court has appropriately refrained from construing the design patent claim "by providing a detailed verbal description of the claimed design," and has instead issued a claim construction order specifying that the claimed design is that "shown in the figures of U.S. Design Patent Number

D530,734 . . . ." (R. 85, Order, Sept. 25, 2009) The images as contained in the patent therefore form the basis of the Court's application of the ordinary observer test.

In some cases, the patented design will be sufficiently distinct from the accused design that the dissimilarity alone will suffice to show that the patentee has failed to prove that "the two designs would appear 'substantially the same' to the ordinary observer . . . ." *Egyptian Goddess*, 543 F.3d at 678. This is the case here, as the designs in the present case are plainly dissimilar when taken as a whole, without improper consideration of particular features in isolation. *See Crocs*, 2010 WL 638272 at *6 ("The ordinary observer test applies to the patented design in its entirety, as it is claimed.").

A side-by-side comparison shows that the two designs, taken as a whole, create overall visual impressions that would appear plainly dissimilar to the ordinary observer. *See Oddz On Prods.*, 122 F.3d at 1405 (directing district courts to focus on the "overall ornamental visual impression" created by patented and accused designs). Here, the scalloped edges in the patented design when compared with the smooth edges of the accused design, and the hour-glass shape of the accused design when compared with the block-rectangle shape of the patented design are important aspects that dominate the overall visual appearance of the respective designs. Staples asserts that the other differences include the removable name plate of the patented design, the indented circles on each of the accused design's keys, the recessed display screen in the patented design, and the different key configurations in each design. Considering all of these asserted distinctions together in the context of the overall ornamental design, no reasonable jury could find that Competitive Edge has met its burden of showing that an ordinary observer would believe the accused design to be the same as the patented design, or even a colorable imitation of the patented design. *See Egyptian Goddess*, 543 F.3d at 679

("[T]he patentee bears the ultimate burden of proof to demonstrate infringement by a preponderance of the evidence.").

When the patented design and the accused design are plainly dissimilar, as in this case, there is no need to look to the prior art, because two designs may be "sufficiently distinct that it will be clear *without more* that the patentee has not met its burden." *Egyptian Goddess*, 543 F.3d at 678. Express reference to the prior art is only helpful "when the claimed and accused designs are not plainly dissimilar . . . ." *Id.* Thus, if the claimed design and the accused design are sufficiently distinct, as here, no comparison with the prior art is necessary. *See, e.g., Wing Shing Prods (BVI) Co. Ltd. v. Sunbeam Prods., Inc.*, 665 F. Supp. 2d 357, 362 (S.D.N.Y. 2009) ([T]here are two levels to the infringement analysis: a level-one or "threshold analysis to determine if comparison to the prior art is even necessary, and a second level analysis that accounts for prior art in less obvious cases.").

The Court therefore follows the ordinary observer test and finds that the accused design and the patented design would be plainly dissimilar to an ordinary observer. As a result, the accused design does not infringe the '734 patent. Staples's Motion for Summary Judgment of Non-Infringement of U.S. Design Patent No. D530,734 is granted.

## II. Trade Dress Infringement

Trade dress "refers to the total image of a product, including features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1067 (7th Cir. 1992) (internal quotations omitted). In order to succeed in an action for trade dress infringement, Plaintiffs must show that (i) their trade dress is distinctive, and (ii) consumers are likely to be confused as to the source or affiliation of the products

because of the similarity between their product and that sold by Staples.  *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998).[4]

Plaintiffs assert that their trade dress includes the following features:[5] 1) soft, pliant, bubbly keys having convex curvature that abut each other without flat sections in between; 2) a calculator top, including the keypad, that is one continuous, contoured surface with the rest of the calculator (except for one small removable rectangle that, at all times that the calculator is in view of consumer, sits flush with the contoured surface in an unobtrusive fashion), in which the keys are differentiated from each other by curved contouring, as opposed to having conventional separate keys that come up through holes in the surface; 3) a bubbly, convexly curved decoration panel spanning the width of three keys, located at the top of the keypad, with a single key on either side and a calculator display above; 4) a convexly curved top portion above the keypad with a rectangular calculator display located within it; 5) keys and other parts of the continuous calculator surface all being the same bright, whimsical color, with only the numbers and symbols on the keys and/or decoration panel being a different color; and 6) a generally curvy, bubbly three-dimensional shape whose dimensions approximate a rectangle with rounded corners.  (CE TD 56.1 Resp. ¶ 44.)

---

[4] Staples appears to argue for an additional, preliminary requirement of proof that the asserted trade dress is of a sort that is protectable, relying upon *Keystone Camera Products Corp. v. Ansco Photo-Optical Products Corp.*, 667 F.Supp. 1221, 1225 (N.D. Ill. 1987).  A more appropriate reading of *Keystone Camera*, however, is that it merely restates the distinctiveness requirement.  *See id.* (explaining that a plaintiff alleging a trade dress violation "must prove initially that it has a protectable trade dress, *in that its trade dress is distinctive or has acquired secondary meaning*.") (emphasis added) (citation omitted).

[5] Staples argues that Plaintiffs' asserted trade dress is not protectable because the definition of what the trade dress is has changed over the course of this litigation, in violation of the rule that protectable trade dress have a stable visual appearance.  However, the alleged changes are not significant amendments to the asserted trade dress, but rather represent supplemental interrogatory responses on matters as minor as the correction of typographical errors.  (CE TD 56.1 Resp. ¶ 50.)  Staples's argument on this point would be valid if Plaintiffs had routinely deleted or added significant items from their definition of the asserted trade dress, but the evidence in the record shows that the basic scope of the asserted trade dress has remained consistent.

## A. Distinctiveness

Plaintiffs can show that their trade dress is distinctive by showing either that it is inherently distinctive or that it has acquired a secondary meaning in the minds of consumers. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). Trade marks and trade dress (the analysis and governing law is the same for both) can be (i) generic, (ii) descriptive, (iii) suggestive, (iv) arbitrary, or (v) fanciful. *See id.* at 768 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-11 (2nd Cir. 1976)). Marks that are suggestive, arbitrary, or fanciful are inherently distinctive. *See Two Pesos*, 505 U.S. at 768. Generic marks are not eligible for protection; descriptive marks, while not inherently distinctive, are protectible if they acquire secondary meaning. *See id.*

### 1. Inherently Distinctive

All of the features that comprise Plaintiffs' alleged trade dress are features of the Bubble Calculator's physical design, with the exception of the mutable characteristic of an unspecified "bright, whimsical color." A product's design standing alone, without a showing of secondary meaning, is not inherently distinctive. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000). Therefore, none of these five physical features of the alleged trade dress is inherently distinctive.

Neither may a product's color, standing alone, make a product's trade dress sufficiently distinctive as to be protectible. *See Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 163 (1995) (color may be used as a trademark where it "has attained 'secondary meaning' and therefore identifies and distinguishes a particular brand"). Therefore, Plaintiffs' final alleged feature, a bright whimsical color or a color scheme consisting of a single bright color for the body of the calculator and a separate color for the number of the keys, is not inherently distinctive.

Of course, it is the "overall appearance of a product" that comprises its trade dress, and not the individual features. *Specialized Seating, Inc. v. Greenwich Industries, L.P.*, 472 F.Supp.2d 999, 1010 (N.D. Ill. 2007). However, it seems illogical that individual features, each requiring evidence of secondary meaning, can be inherently distinctive without such a showing in combination. Neither have Plaintiffs argued that these features can, in combination, be inherently distinctive.

Therefore, Plaintiffs' asserted trade dress is not inherently distinctive.

### 2. Secondary Meaning

A trade dress that is not inherently distinctive can become distinctive upon a showing of acquired secondary meaning, that is, if the mark has become a distinctive indicator of the identity of a plaintiff's goods in the steam of commerce. 15 U.S.C. § 1052(e), (f); *see Two Pesos*, 505 U.S. at 769.

Several factors are considered in determining the existence of secondary meaning. Direct evidence of secondary meaning may be shown via direct consumer testimony or consumer surveys, while circumstantial evidence can be drawn from consideration of the exclusivity, length, and manner of use of the trade dress; the amount and manner of advertising; the amount of sales and number of customers; whether the plaintiff has an established place in the market; and whether there is any proof of intentional copying. *See Spraying Sys.*, 975 F.2d at 393; *Echo Travel, Inc. v. Travel Assoc., Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989).

<u>*Direct Consumer Testimony*</u>

Plaintiffs argues that their expert, Dr. Eldon Little ("Little"), is a consumer of promotional products and "testifies that he would associate the Bubble Calculator's trade dress with Plaintiffs." (CE TD Brief at 8.) However, Little does not say he would make this association. At best, Little

testifies that he believes that others would do so, without providing an independently admissible basis for this opinion.  (Little TD Decl. ¶¶ 10-13.)

Greenspon testified that several distributors of promotional products associate the Bubble Calculator with AdVantage.  (Staples TD 56.1 Reply ¶ 28.)  On a motion for summary judgment, this evidence will not be discounted solely due to Greenspon's possible bias as owner of Competitive Edge.  *See Thomas & Betts Corp.*, 138 F.3d at 293.  However, Greenspon's tesimony on this point is unsupported by any evidence from the distributors themselves, such as affidavits, attesting to this association.  *Cf. Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 2000 WL 1428665 at *13 (S.D. Ind. 2000) (affidavits from wholesaler and retailers sufficient to establish at least some link between product and supplier).  Greenspon's second-hand report on this matter is mere hearsay offered for the truth of the matter asserted, and would not be admissible evidence; therefore, it cannot be deemed to have established an issue of material fact on summary judgment.

Thus, Plaintiffs have not presented any admissible and probative evidence of direct consumer testimony that would weigh in favor of a finding of acquired secondary meaning.

### Consumer Surveys

As discussed at length above, neither Plaintiffs nor Staples have provided admissible consumer survey evidence.  Therefore this factor cannot affect the secondary meaning analysis in this case.

### Exclusivity, Length and Manner of Use

Plaintiffs make no explicit claim that they have used their alleged trade dress exclusively. They do, however, claim to "vigilantly police their trade dress by finding entities that might be copying it and forcing them to stop."  (CE TD Resp. Br. at 9.)  However, Plaintiffs point only to one

instance before Staples's alleged infringement of their trade dress in which Plaintiffs purport to have policed the use of their trade dress. Plaintiffs apparently filed a complaint in Iowa against Target Corporation, but Plaintiffs have not supported (with admissible evidence in the record) their assertion that this complaint included or in some way constituted a claim of trade dress infringement. (Staples TD 56.1 Reply ¶ 33.) There is no direct evidence, therefore, supporting Plaintiffs' claim of vigilant policing of their trade dress.

Staples contends that the License Agreement between Competitive Edge and Staples is evidence that Plaintiffs allows others to use their alleged trade dress. (Staples TD Br. at 10.) The License Agreement allowed Staples to continue selling The Staples Brand Bubble Calculator. (Staples TD 56.1 Reply ¶ 31.) The record shows that the licensing agreement was part of a settlement reached to avoid litigation. (Staples TD 56.1 Reply ¶ 31.) Finding that Plaintiffs abandoned exclusive use of its trade dress by allowing Staples to sell off its remaining inventory as part of a litigation settlement would penalize Plaintiffs for attempting to effectively and efficiently stop Staples's infringement outside of the courtroom, which the Court declines to do.

Further, Plaintiffs have been using its trade dress for nearly five years. (Staples TD 56.1 Reply ¶1.) This extended period of use weighs in favor of a finding of secondary meaning. *See Echo Travel*, 870 F.2d at 1270 (nothing that no particular period of use is required and that secondary meaning can be acquired after a brief, if intensive, period of use).

### *Amount and Manner of Advertisement*

Competitive Edge has spent roughly $400,000 on advertising *containing* the alleged trade dress. (Staples TD 56.1 Reply ¶ 24.) However, this advertising is in the form of catalog placement and is shared with many other products. (CE TD 56.1 Resp. ¶ 38.) The amount of advertising expenditure is therefore shared between all of these products. This makes the actual amount of

money spent on advertising for the alleged trade dress undeterminable, or at least only a fraction of the overall cost. Thus, this $400,000 aggregate figure sheds little probative light on the question of whether the alleged trade dress of the calculator has acquired secondary meaning in the eyes of its consumers. *See Echo Travel*, 870 F.2d at 1270 (noting that "the effect or success of the advertising, not the mere fact of advertising" is the relevant test for secondary meaning).

### Amount of Sales and Number of Consumers

Plaintiffs do not contend that its sales revenues are probative of secondary meaning. (CE TD 56.1 Resp. ¶ 64.) Neither party argues that the number of customers of the Bubble Calculator is probative of secondary meaning. Therefore, this factor does not weigh either for or against a finding of acquired secondary meaning.

### Established Place in the Market

Plaintiffs argue that they have tried to establish a place in the relevant market. (CE TD Resp. at 12.) However, Plaintiffs fail to provide any evidence that Competitive Edge enjoys such an established place. Competitive Edge is but one of thousands of distributers in the promotional products market. (CE TD 56.1 Resp. ¶ 65.) The large number of distributors combined with the lack of a demonstrated established place in the market weighs against a finding of secondary meaning.

### Proof of Intentional Copying

Intentional copying can be probative evidence of secondary meaning. *See Thomas & Betts Corp.*, 65 F.3d at 663 (copying is evidence of secondary meaning where the defendant's intent is to confuse consumers). In the present case, Plaintiffs claim that Staples intentionally copied the Bubble Calculator trade dress (CE TD Resp. Br. at 6-7) and provides evidence in the form of internal email and notes from Staples's product designers. (Staples TD 56.1 Reply ¶ 32.) Evidence of copying can be sufficiently probative to create an issue of material fact as to whether the trade dress has acquired

secondary meaning.  *See, e.g.*, *FASA Corp. v. Playmates Toys, Inc.*, 869 F.Supp. 1334, 1357 (N.D. Ill. 1994).  The actual evidence of copying provided here is relatively weak, however, as the internal emails cited by Plaintiffs can be read as indicating that Staples was actively trying to design a product that did not copy the intellectual property embodied in the Bubble Calculator.  Taken as a whole, the circumstantial evidence that Plaintiffs have provided in support of their claim of intentional copying is insufficient to create a genuine issue of material fact with respect to this factor in the secondary meaning analysis.

The length and apparent exclusivity of Plaintiffs' use of the trade dress is therefore the sole factor weighing in favor of a finding that it has acquired secondary meaning.  The lack of admissible direct consumer testimony and Competitive Edge's lack of an established place in the promotional products market weighs against a finding of secondary meaning, while the remaining factors are irrelevant or inconclusive.  As a whole, the Court finds that Plaintiffs have therefore not established even a disputed issue of material fact that their asserted trade dress, which is not inherently distinctive, is nevertheless protectible because of an acquired secondary meaning.  No reasonable jury could find on the basis of the evidence currently in the record that the trade dress of the Bubble Calculator  has become a distinctive indicator of the identity of Plaintiffs' goods in the steam of commerce.  Staples is accordingly entitled to summary judgment on the grounds that Plaintiffs do not have a protectable trade dress that it could be held liable for infringing.

Although as a general matter, "a court doesn't even reach the question of likelihood of confusion until persuaded that the putative mark is sufficiently distinctive to warrant prima facie protection as a trademark," *see Spraying Sys.*, 975 F.2d at 387 (7th Cir. 1992), and the Court is not so persuaded here, the Court will nevertheless proceed to the likelihood of confusion analysis in order to aid the parties.

**B. Likelihood of Confusion**

When determining likelihood of confusion, the following factors are relevant: 1) the similarity of the trade dresses, 2) the area and manner of concurrent use, 3) the degree of care likely to be used by consumers in selecting amongst similar products, 4) the strength of the plaintiff's trade dress, 5) the existence or absence of actual confusion, and 6) the intent of the defendant to pass off its product as that of the plaintiff. *See Thomas & Betts*, 138 F.3d at 296.

### Similarity of Trade Dresses

Products are deemed to be similar for purposes of the trade dress analysis if the accused product "is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by" the holder of the protected trade dress. *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 900 (7th Cir. 2001) (internal quotations omitted). Staples's expert witness, Michelle Elster ("Elster"), testified that many similarities exist between the Staples Pillow Top Calculator and the AdVantage Bubble Calculator. (Staples TD 56.1 Reply ¶ 40.) This does not demonstrate that the two products are similar as a matter of law, however, because Plaintiffs have presented no evidence that Staples's Pillow Top Calculator is reasonably likely to be thought by consumers of as closely related to the Bubble Calculator. Because there is no admissible evidence in the record supporting a conclusion that the buying public would believe the Pillow Top Calculator to be affiliated with, connected with, or sponsored by the producer of the Bubble Calculator, this factor weighs against a finding that confusion is likely.

### Area and Manner of Concurrent Use

In considering the area and manner of concurrent use of the protected and allegedly infringing trade dress, the Court must assess whether "there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d

434, 442 (7th Cir. 1990). Evidence concerning the relative geographical distribution areas, the presence or absence of direct competition among the products, and whether the products are sold through the same marketing channels is relevant to this inquiry. *See Ty, Inc.*, 237 F.3d at 900.

The parties agree that the AdVantage Bubble Calculator is used primarily as a promotional product. While Staples argues that it sells the Pillow Top Calculator in a different "stream of commerce" and appears to primarily target the education-related retail market for its sales of the Pillow Top Calculator, (Staples TD Br. at 14), there is evidence that Staples has given its products away as promotional items. (Staples TD 56.1 Reply ¶ 14.) The extent to which the area and manner of use overlaps is thus in dispute. Resolving this factor in favor of Competitive Edge, it weighs in favor of a finding of likelihood of confusion.

### *The Degree of Care Likely to be Used by Consumers*

Plaintiffs do not dispute that "consumers of the AdVantage Bubble Calculator . . . are sophisticated buyers." (CE TD 56.1 Resp. ¶ 26.) Therefore, the degree of care used by these consumers in selecting amongst similar products is likely to be high. This factor weighs against a likelihood of confusion.

### *The Strength of Competitive Edge's Trade Dress*

As discussed above, Plaintiffs have not demonstrated that they have a protectible trade dress. Therefore, this factor weighs against a finding of likelihood of confusion.

### *Instances of Actual Confusion*

Plaintiffs have provided no evidence of actual confusion, but argue that evidence of mixing Bubble Calculators and Pillow Top Calculators in Staples stores is in fact such evidence. (*See* CE TD Resp. Br. at 15.) However, there are countless possible reasons for this mixing. Indeed, there is evidence in the record that the products are mixed in the bins not because of employee confusion,

but because Staples specifically instructs its stores to mix the two products in a single bin. (Staples DP 56.1 Reply ¶ 24.) Competitive Edge points to a single reported instance in which a Staples employee purportedly rang up two Staples Brand Bubble Calculators as Pillow Top Calculators, but does not support this anecdote with any admissible evidence; even if the incident were properly documented, it would not show that the error resulted from the cashier's confusion as to the identity of the two products as opposed to a computer error or other explanation. (See Staples DP 56.1 Reply ¶ 23.) This evidence cannot be considered probative of actual confusion.

Thus, the only evidence that Plaintiffs have presented supporting an inference that consumer confusion is likely is the evidence that both Plaintiffs and Staples provide calculators for use as promotional and marketing items, and thus that there is at least some overlap in the area and manner in which the asserted and allegedly infringing trade dresses are used. Weighing against a finding of confusion are the lack of evidence showing similarity of the trade dresses (a finding consistent with, although not dependant upon, the Court's holding of non-infringement on clear dissimilarity grounds), the fact that consumers of Plaintiffs' products are highly sophisticated buyers likely to be careful in their buying choices, the weakness of Plaintiffs' trade dress, and the lack of evidence of instances of actual confusion. Even drawing all inferences in Plaintiffs' favor, no reasonable jury could find that consumers are likely to be confused as to the distinction between Plaintiffs' product and that sold by Staples. Accordingly, even if Plaintiffs had presented facts supporting their claim to having a protectible trade dress, Staples would be entitled to summary judgment on non-infringement grounds because there is no likelihood of consumer confusion.

Staples's Motion for Summary Judgment of non-infringement of Plaintiffs' alleged trade dress is therefore granted.

## CONCLUSION AND ORDER

Staples's Motion *in Limine* to Exclude the expert testimony of Plaintiffs' expert, Dr. Eldon

Little, is granted.  Staples's Motion to Strike is denied as to Plaintiffs' excess statements of fact in

violation of Local Rule 56.1, and dismissed as moot with respect to the testimony of Eldon Little in

view of the Court's ruling on the Motion to Exclude.  Staples's motion for summary judgment of non-

infringement of U.S. Design Patent D530,734 is granted.  Staples's motion for summary judgment

of non-infringement of the Bubble Calculator trade dress is granted.


_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois


Date: March 29, 2010